The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. We are going to hear our third case here, GW Acquisition v. Pageland Limited Liability Company, Mr. Weisbuck. Thank you, Your Honor. May it please the Court, Mike Weisbuck for the Brouwer Parties. We've raised several issues in this appeal, but I'd like to start with our argument that Brouwer's cure should have precluded the District Court's grant of summary judgment to GWA on its breach of contract and declaratory judgment claims. Of course, we also strongly urge that Brouwer should have at least gotten discovery on the claims that were dismissed at the pleading stage and that he should have gotten to a jury on the claims against GADBAN, and I'm happy to answer questions on those points. But the cure is important because it should wipe out both of GWA's claims on any basis for any fee award to GWA. And there's really no dispute that the cure was timely, that it was within the window provided in the contract. GWA itself has referred to their February 27th letter as the notice of default, so if you calculate from there, the cure is timely. So the issue really boils down to waiver, I think, and there's no waiver here for three independent reasons. First, GWA filed an amended complaint four months after Brouwer filed his answer, and Brouwer raised the cure issue in the dispositive cross-motion briefing that immediately followed the filing of the amended complaint. So that's not really... But that doesn't amend your pleading, does it? Well, the amended complaint completely displaces the original complaint, resets the Rule 8 and Rule 12 deadlines. I thought you were saying that you raised this for the first time in a... Where did you raise it for the first time? So there's no immediate responsive pleading to the amended complaint because the parties stipulated to cross-motion dispositive briefing. So that doesn't implicate the Rule 8 requirement that you raise in affirmative defense in your responsive pleading because they're stipulated cross-motion briefing. So that's just not a waiver scenario at all. He raised it in his opposition to GWA's motion for summary judgment immediately following the filing of the amended complaint. So that's reason one. And these are three independent reasons, right? So even if you ignore that, the cure isn't in affirmative defense, right? As we say in our brief, this goes straight to the elements of GWA's claims because the contract itself says you can't declare a default or enforce the contract via lawsuit if there's been a timely cure. So GWA says the first two elements of our claims are an enforceable duty and a breach. Well, here you have neither under the contract because of a timely cure. So in affirmative defense, it's external to the elements of a claim, right? But this goes straight to the first two elements of their claim. And then the third point, Your Honors, is the district court acknowledged that prejudice is required for a waiver in this context under this court's Brinkley decision. But there's no prejudice here. There's no disputed facts. We know when the notice of default was provided. We know when Brower signed the rezoning form. There's no way that discovery could have made a difference here. And that's putting aside the filing of the amended complaint after the discovery window had closed, right? So I'm not sure how they can claim unfair surprise or inadequate opportunity to rebut when Brower raised the issue in his opposition to their motion for summary judgment right after they filed an amended complaint. So any of those three reasons is enough to overcome the district court's waiver holding and simply look at the straightforward cure within the window specified in the contract. And like I said, that should knock out both GWA claims because the cure provision says the party can't exercise the remedies described in the contract if there's been a timely cure. Well, what are those remedies? Any and all remedies in law are equity. So no nominal damages, no declaratory judgment, no attorney's fees. So for each of those reasons, GWA should not have been granted summary judgment on its two claims. Summary judgment should have been awarded to Brower on those claims. And of course, the practical effect of that, as far as the parties are concerned, is it wipes out the fee award, the large fee award in this case. So if there are no questions on that point, I can turn to Brower's claims. And I think with respect to the claims that were dismissed at the pleading stage, I can try to simplify things a little because I know there are a lot of claims that can get kind of confusing pretty quickly. So in terms of the claims we're pushing, it's the same general fact pattern, right? GWA agreed or conspired with GADBAN that GADBAN would steer the sellers towards GWA in exchange for certain things from GWA. So that applies to the conspiracy to defraud and breach fiduciary duties and the tortious interference claim, right? Same general facts. Now, I think it's useful to sort of divide those facts into two parts. There's the conspiracy or agreement between GWA and GADBAN. That's the first part. And then the second part is what GADBAN allegedly did pursuant to that agreement or conspiracy. I don't think there's any dispute that we adequately allege the second part that as sort of the primary wrongdoer in the conspiracy, GADBAN breached her fiduciary duties, engaged in material misrepresentations. She didn't move to dismiss the direct fraud and breach of fiduciary duty claims against her. You're dealing with the sort of core of Judge Brinkema's decision, which was that you simply breached the PSA, which obligated you to cooperate and support GWA in its efforts on the rezoning. Right. You're accusing them of breaching the contract, but Judge Brinkema found that you had a contractual obligation to support GWA in its efforts to have the property rezoned. And that you didn't do that, and he knew of documents that you had to sign, and you declined to sign them. Right, Your Honor. So that goes back to the cure point, but my client did ultimately sign the documents within the... The point Judge Brinkema made was that when you had to be forced to table, that you only signed the documents to assist GWA, and the court ordered you to do so. If the court hadn't ordered you to sign them, they would be unexecuted to this very day. Right, Your Honor, but there's no litigation exception to a clear notice and cure provision. We've cited Virginia cases saying that, that even after litigation commences, a party can still cure. And it's not my client's fault that GWA jumped the gun and sued and got an ex parte TRO during the cure window. I think the court would basically be opening the door for parties to ignore clear cure provisions and rush to the courthouse when there's an alleged default, rather than following the plain terms of the contract that GWA drafted. One thing we've consistently held is that these breach of contract claims... A breach of contract is not a tort, and yet you've just strung along all these tort claims to the breach of contract claims. And what are you claiming, tortious interference, unjust enrichment, and I guess other things, but normally we say that a breach of contract, for very good reasons, is subject to its own rules of damages. Right. And we don't import tort notions and tort rules of damages. Just to be clear, Your Honor, we're not pushing a breach of contract claim against GWA. After these tortious interference claims and unjust enrichment claims, you're not content with it being a breach of contract? We're not pushing breach of contract theories against GWA at all. But why all these tort claims in there? You want punitive damages for breach of contract? No, again, we're not pushing a breach of contract theory. The theory is GWA agreed or conspired with GADBAN, the broker, for her to steer sellers to GWA, in exchange for certain benefits from GWA. There's no breach of contract there. So Brinkman was concerned that you came to this with unclean hands, that you were the ones that had breached your obligations. Right, Your Honor, but that view is inaccurate because... Well, you signed the PSA agreement, didn't you? Your Honor, my client... This gets into the summary judgment record. My client signed the PSA agreement without full information. Didn't the PSA agreement obligate you to use your best efforts to assist GWA in getting the property rezoned? I mean, you did sign the agreement. Right. You were obligated under the agreement to use your best efforts. The district court found you didn't and had to be enlisted ways in which you did nothing and then said that whatever you were done were done because you had your arms twisted and were told to sign documents that you should have in the course of performance done yourself. And then you were coming along and accusing the other people of breach of contract when the PSA agreement is before us plain as day that you signed. And you did not follow through with it. And you thought, well, you know, I can get a better deal elsewhere, and the contract was presented to us in conspiratorial terms, and we were unaware of this and that, and you raised a fraud claim and everything else. But when you strip away all that, we're dealing with the fact that you were aware of this. You know, you were told if you had a problem with it, don't sign it. But you signed it. Your Honor, I think we're confusing the timeline of what happened. So to get into the – this is like the summary judgment record a little bit. My client did not have full information when he signed the contract. And regardless of what you think about our here arguments, I think you're invoking this sort of futility exception that does not exist under Virginia law. And certainly is nowhere in the contract, which provides exceptions in the CURE provision. But not for this. The broker said repeatedly that if you weren't happy with GWA and with GWA's offer, then don't sign the PSA. On September 7th. And he went ahead and signed it, none the less. Your Honor, that was September 7th. Three days later, it's undisputed that the broker arranged a meeting with Kuhn, which appeared to violate the exclusivity provision in the contract, which was binding. And then the day before the deadline to sign the PSAs, she misleadingly threatened my client that he could be sued. I thought there was a finding that Kuhn was aware of the Kuhn offer and the other offer. Two months before you signed the GWA. That doesn't go to the misleading threats that he could be sued for breaching the binding exclusivity provision. You felt like you could get a better deal somewhere else, so you wanted to get out of this contract. No, Your Honor. If that were true, my client would not have confronted. One more question. One, a better deal and more money and feeling that your property under the PSA agreement that you signed was not, you weren't getting what you wanted. Your Honor, that's for the jury to decide. Because the exclusivity provision, JA-669, all caps in the listing agreement says binding exclusivity. You can't negotiate with anyone else. For 60 days. For 60 days. So during that 60-day window, my client hears about the superior Kuhn offer for the first time, immediately confronts GADBAN. It's not seller's remorse when you go confront the broker. As soon as you hear about this superior offer before signing the final PSAs and say, hey, what happened here? Why wasn't I apprised of this? And then, as GWA emphasizes, my client spent the next six weeks saying, I want to get out of this. I want to defect. And then there's evidence in the record that the day before the deadline to sign, she says, hey, by the way, you can be sued if you don't follow through and sign. And that's credible because they had a meeting with another potential purchaser that she arranged which appeared to violate the binding 60-day exclusivity provision. So your sort of seller's remorse narrative that, Judge Wilkinson, you're accepting that the district court went with, it's at least disputed on this record that my client wanted out of the deal before he ever signed the PSAs and felt like he was in a catch-22 as a result of his broker's actions and misrepresentations. Well, I'm just wondering, you know, that you signed an agreement and some information came along that the agreement was, you know, hard negotiated as contractual agreements are. And then after you signed the agreement, you were hit with a bit of buyer's remorse and thought, well, I can get a better deal elsewhere, so I won't slip out of this one in some way. The record is open to that interpretation. May I answer, Your Honor? I disagree that the record's open to that interpretation, but if the record is also open to my interpretation and there's record evidence supporting my interpretation, that question's for the jury, not for the district court of this court. Thank you. All right, let's hear the other side of it. Morning, Your Honors. May it please the Court. I'm Michael Tucci on behalf of GWA Acquisition Company, LLC. I think, Judge Wilkinson, you've sort of hit the nail on the head, and it's the same nail that Judge Brinkham hit squarely on the head as well. It's a case of seller's remorse, plain and simple. They tried to get out of the contract, and it didn't work at the district court, and it shouldn't work at this court. I will address briefly some of the claims that were made that first. They're saying that you hid all sorts of things from them and that you didn't tell them about the gun keying or whatever offer and that they were sort of blindfolded when they signed the agreement. What do you say? Well, the undisputed factual record demonstrates that that's absolutely inaccurate. What you just heard was that there was a 60-day exclusivity period on the GWA letter of intent. True. But the meeting that occurred in September with Kuhn and Gadban and the Pageland entities, they were all in that meeting, and GWA gave its permission for that meeting to happen. They went to GWA and said, we have this exclusivity. Would you allow us to meet with another group? We said yes. Was it Kuhn? That was Kuhn. We said yes. We allowed them to have the meeting. They had the meeting. All of the issues were aired at that meeting, and Brower still, at the end of the day, signed our deal. He had six weeks to evaluate the Kuhn offer and our PSA, and what did he do? He signed our PSA. So that's that there's anything hidden here. I mean, talk about being most upfront as possible. How many developers would you know that would give an opportunity for their sellers to go meet with somebody else to see if they'd get a better deal? We were the utmost fair-minded people in this negotiation. Well, weren't they still obligated under the terms of the letter of intent to negotiate with you and sell to you if it was practicable? Not if they had a better deal. They could walk away from ours. It was a 60-day LOI. So at the end of those 60 days, two things had to happen, sign our deal or walk away. They all chose to sign our deal, and the reason is, and it's all in the record, is that our deal was superior. There may have been a little bit more money on the Kuhn deal, but the conditions on our deal were far superior. It limited the development to data centers. It did not expand it beyond data centers, which the Kuhn deal did. And the reason that was important is because it was widely known that the only thing that this land would ever be rezoned for was data centers. So our deal had a better chance of going through to fruition, and I can happily report that the rezoning has happened and this project is moving forward. I don't have a hard time seeing what Judge Brinkman did wrong. I think it was a very well-reasoned opinion, but I think she got a little irritated when she had to order the folks here to actually sign documents that would have assisted in the rezoning effort, and she's sitting there ordering them to comply with the terms of an agreement that they had signed. Black and white. Terms of an agreement they had signed. And, you know, that's an odd position for a district judge to be in. They don't normally order certain things as a matter of contractual performance. And, you know, I mean, I commend Judge Brinkman for doing it. She tried to get them to live up to what they had agreed to. And so they had a gun to their head and they finally signed the documents. And, you know, Judge Brinkman at one point said, wait a minute, enough. And, Your Honor, there was a companion case after this case. We had to file in 2023 because the next document we asked them to sign, guess what? They refused to sign it, too. So we had to file another lawsuit. And we got it sent to Judge Brinkman as a related case, and she enters an order saying, what's going on here? I ordered you to sign the documents in the last case. Why is this now back before me? Sign the doggone documents. So we have to agree with you about this defense about cure and notice being waived, correct, in order to affirm summary judgment? No, because there are several reasons why the cure doesn't apply here. The most important one is what are we really talking about when we're talking about a cure? I think all of us would agree that in a normal contractual situation, a cure is something like you didn't pay your real property taxes under a mortgage, and here's a notice and pay the real property taxes. What happened here? Three letters were sent to Pageland to sign the rezoning form. They ignored each one. Filed a lawsuit. Had to engage outside counsel. Had to serve the lawsuit, which was difficult because the managing member of Pageland was evading service at this time. We had to have a TRO hearing, which was duly noticed. Let me stop you right there. Before we get there, once they fail to promptly sign the document, that's a default, correct? It is. And that's what triggers the notice requirement, doesn't it? Yes. Okay. So I'm just trying to understand your argument as to why the cure and notice provision doesn't apply, if I understood your argument correctly. Well, to be honest with you, it's confusing because the argument from the other side is we cured because of the TRO that was entered, but you didn't have the ability to ask for the TRO because you couldn't invoke your remedies until after the 30-day period. You can't have it both ways. You can't argue out of both sides of your mouth on this issue. That was a default. We sued. We got the relief that we were entitled to at that time. You know, the 30-day cure period, or quote, unquote, cure, doesn't apply to a situation like this, which is basically holding the entire development hostage over not signing forms that, and there's 12 agreements here. We're not just talking about one agreement. There are 12 agreements. And in all 12 agreements, we had to file the rezoning application on February 28th. And we couldn't file a complete application because they hadn't signed the forms. This whole project could have been scrapped because of that. But you do argue that it is waived, this defense. It is waived. What is the relevant facts as it relates to the waiver issue? Well, the first time this was raised was in a reply brief to an opposition, our opposition to their motion for summary judgment. Okay? It was, and the first time this actual cure argument has been made has been in this court. It was never made in the district court. So it's waived for that reason. The second, another reason it's waived is because the failure of a notice and cure provision is an affirmative defense. It's never been argued, it's never been established that the affirmative defense was ever raised in the district court. So for that reason, it's also waived. The futility argument that's in our briefs as well, futility does apply in Virginia. It's never been said that it doesn't apply in Virginia. Do you have a Virginia case? We have a Maryland case. It's actually the best one on it. And let me. That was Judge Gritsky's case. I'm sorry? It's in the footnote of your brief, footnote number six. Could be. On page 28. This is Hippocratic Growth. Yes, yes. It's a well-reasoned decision that we rely on. And I would say that the two Virginia circuit court cases that are relied on by the appellants are, if you look at the cases, they're not applicable at all. They're apples and oranges. They don't apply here. So it sounds like no Virginia court has recognized this futility issue. But it sounds like they also haven't rejected it. Correct. Yeah, I think that's probably a fair characterization. All right, sir. If nothing else, Your Honors, I see my time is about expiring. We would ask that you affirm Judge Brinkman's decision. Thank you. All right, Mr. Ross. Good morning, Your Honors. I'm here on behalf of Ms. Gadban and her broker company. And Ms. Gadban is with us in the courtroom today. As you've heard, the essence of Mr. Brower's claim is that he was not timely made aware of an offer from Mr. Kuhn. But it's not disputed that he became aware of that offer long before he signed his contract with GWA. He knew that his LOI with GWA was non-binding and had an expiration date of 60 days, as Mr. Tucci was just referring to. And Judge Wilkinson, as you noted in one of your questions a moment ago, Ms. Gadban at a meeting repeatedly told Mr. Brower, if you're not happy with the deal, get out. And then finally, after that, she obtained for him a follow-up offer from Mr. Kuhn that he did receive. He had at least five weeks to review it. He reviewed it with his counsel numerous times and his trusted advisor. And he concluded to go with GWA, not with Mr. Kuhn. None of that is disputed. So recognizing that, what they do is they try to say, but when Mr. Brower signed the LOI, he wasn't aware of the prior Kuhn offer and the LOI had an exclusivity provision, which Mr. Tucci talked a little bit about. But as with many issues in this case, Mr. Brower's own acts and deeds show that the exclusivity provision was of no moment to him. And let me, because this went on summary judgment, I want to highlight a couple of facts that were undisputed and came out of Mr. Brower's mouth. In the September 7th meeting that Judge Wilkinson was referring to and learned it opposing counsel as well, Ms. Gabin told him repeatedly, if you don't like this deal and you want to go with Mr. Kuhn, get out. And she said finally at one point, be happy or get out. And what's very instructive is Mr. Brower's response. He said, fair enough, can't complain about that. Very telling, those are his words. And Ms. Gabin said, and if you get out, no hard feelings. Also undisputed that during that meeting they discussed Mr. Kuhn's offer that he came to meet with Ms. Gabin about. And they talked about the fact, and Mr. Tucci alluded to this, that there was a zoning issue in Mr. Kuhn's offer that was far less favorable. The county was going to be less receptive to it. And there was no hard closing date. And importantly, Mr. Brower admitted both of those issues in the Kuhn offer were of concern to him. And then very tellingly, again out of his own mouth, the very next day he sent an email to a fellow seller, a person that he had reached out to prior to his meeting with Ms. Gabin on September 7th. And he was following up with that person after the meeting. And he said to this person, Mr. Abelhausen, he said, something I came up, I thought you should know about. But I sat down with Mary Ann and Carter and got it explained to me. It was not what I thought. So disregard. Very, very telling. Again, out of Mr. Brower's mouth. But after that, Ms. Gabin went the extra mile. She set up a meeting with Mr. Kuhn. Mr. Brower attended that meeting. As a result of that meeting, they got a follow-up offer. And as Mr. Tucci noted, that was done with GWA's consent, which is pretty impressive, frankly. Mr. Kuhn sends a follow-up offer. There's no dispute that Mr. Brower got this offer. He then had five weeks to consider that offer. His privilege log shows that on no fewer than eight occasions, he had an email communication with his lawyer about that offer. He also admitted that during that five-week period, he forwarded the GWA purchase and sale agreement, a red-line version of it, to his trusted advisor, Mr. Dosky. And Mr. Dosky said, well, I don't have any concerns with it either. But then on the day before the LOI was to expire, Mr. Brower had one last communication with his lawyer. And this is very, very instructive and very critical. And he asked the lawyer if he might get sued if he got out of the deal with GWA. Now, mind you, he didn't ask. He admits this. He did not ask whether he would have meaningful exposure if he did it. He just said, might I get sued? And his lawyer said, well, you might get sued, but you might not. And the – what does that – The record has it in those specific terms? It does, Your Honor. And that is at 12-12 to 12-14, Your Honor. Thank you. And then when asked in his deposition about that conversation, I said to him, and is that why you signed that discussion with your lawyer? Is that why you signed the purchase agreement with GWA? And he said, yes, as a result of that conversation with my lawyer, not with Ms. Gadban, I decided to sign the purchase and sale agreement with GWA. And that's also at JA 12-14. So he's admitted that the reason he signed the agreement was his consultation with his counsel, not because of some after-the-fact supposed threatening statement that Ms. Gadban made. It had nothing to do with that. And the admission that he did it based on his conversation with his counsel eliminates any claim against Ms. Gadban or his broker company. It's all – This all has a surreal quality. It does. Honestly, Your Honor, it's a little bit – I was thinking about this, and I hope this doesn't appear glib to the Court. But it's a little bit like whack-a-mole, because every time we would knock down an argument, something else would pop up, and it's all over the lot. But the fact of the matter is, he knew full well what he was doing. He had five weeks to consider this competing offer. We're all well aware of moving targets. I'm sure you are, Your Honor. Yes. And that's exactly what this was. But he made a considered decision with five weeks to think about it, based on advice of counsel and his trusted advisor, had nothing to do with any supposed threats with Ms. Gadban, and he admitted that. He said, yes, I made the decision to proceed with the PSA with GWA based on that last conversation I had with my lawyer, when the LOI would have expired the very next day. And although all of that is alone dispositive, on top of that, if Ms. Gadban had supposedly said – and of course she denies it – that she was threatening him that you'd be sued, that would have been non-actionable opinion. It's a statement about what might happen in the future by a third party. It's not something that could be acted upon. But Your Honors don't even need to consider that, because Mr. Brower, again, out of his own mouth said, no, I decided to go forward with the PSA with GWA – a lot of acronyms in this case, sorry – based on that last conversation I had with my lawyer. Thank you. Thank you, Your Honors. Thank you. Thanks. Your Honors, I've brought a portion of the record up here with me because it directly refutes the narrative that you've just heard. So in terms of what happened in GWA giving – This is a very simple case, and that is that with full awareness, you signed an agreement. Then you tried to get out of the agreement when you thought you had a better deal. You didn't conform with the agreement. Judge Brinkman had to force you to do what you had committed to in the contract. And then you have the gall of saying that these folks, these defendants, were somehow the ones that breached it and tortiously interfered and unjustly enriched themselves and committed fraud and everything. You had the gall to do that after you had signed an agreement and did everything within your power to slip out of it. And this is – you're lucky you didn't get showered with counterclaims. Your Honor, we were actually the ones bringing the counterclaims they sued. But let me just clarify the record. I understand your view of the case is unfavorable, but let me just say what the record makes clear, okay? It's undisputed that Gabin didn't disclose the superior Coon offer. We have evidence, sworn testimony, that she threatened my client that he could be sued the day before the deadline. Now, they say, well, actually, this meeting with Coon that appeared to violate the binding exclusivity provision, GWA gave permission for that. But her threats were credible from my client's perspective, if you put yourself in my client's shoes, because he testified under oath that she never told him that she had gotten permission for that meeting. I can read to you from the record, did you know that was because Mary Ann had gotten permission? I didn't know. No, I just know that she arranged it. And then in terms of the lawyer's advice in that last day meeting where she threatened that he could be sued, his lawyer was on speakerphone. And the lawyer didn't just say maybe, maybe not. Remember, the question here is whether he could be sued for violating the exclusivity provision. That's what put him in the Catch-22. Not whether he would definitely be sued, but whether he had to choose between risking a lawsuit because of the apparent violation of the exclusivity provision and signing the deal. So his lawyer said, I'm quoting again from the record, yeah, I could be sued. Will they sue me? Maybe, maybe not. So the lawyer said, look, yeah, it seems like what happened here is your broker arranged a meeting that violated the binding exclusivity provision, so you are in a tough spot. You either have to go forward with this deal, you could be sued because of this meeting, no one told him that he had permission. This has no relevance, we're just talking. It's directly relevant to our fraud and breach of fiduciary duty claims against Gabban because she misleadingly threatened him. That's in the record. Your Honor, you can't resolve these disputes about the facts in the record on summary judgment. That's for the jury to decide. So on the cure point, the project could not have been unraveled as a result of my client not signing by February 28th. I want to make that very clear. The February 28th deadline was not a county deadline. It was in the same contract that GWA drafted containing this very clear notice and cure provision that they want to read out of the contract. And as you pointed out, Judge Maddox, they have no Virginia cases on this. Their Maryland case, the Hippocratic case, it's also distinguishable. The court in that Maryland case said, oh, actually, I see these other Maryland decisions have acknowledged there's no futility exception under Maryland law either, so I have to distinguish those. And there, the party seeking to invoke the notice and cure provision had actually affirmatively terminated the contract. So the court was basically saying, you know, at least when you go and terminate the contract that contains this cure provision, you can't turn around and invoke it. That's not the case here. And, I mean, I just think generally the cure provision is crystal clear, and Judge Wilkinson, I know you're very concerned that Judge Brinkema had to enter a TRO. My client signed after the entry of the TRO. That is the direct result of them jumping the gun and filing a lawsuit during the cure window. They drafted this contract to have that February 28th deadline, which, again, was not a county deadline. And, by the way, it didn't matter because my client cured within the cure window but almost a month later. And when there is a futility exception that applies in these other jurisdictions, it only applies when the cure is incurable. Well, we know now the cure was curable because he signed the contract, and everything went forward as they emphasized. The rezoning process is proceeding. Everything's good. Thank you, sir. Thank you. We ask that you reverse. You okay? Yes. You okay? Yeah. All right, thank you. We'll come down and greet counsel, and we'll proceed into our final case.
judges: J. Harvie Wilkinson III, Robert B. King, Matthew James Maddox